UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONSUMER REPORTS, INC.,

Plaintiff,

-against-

BENJAMIN MOSKOWITZ, TWO PLANETS AWAY LLC, and GINNY FAHS,

Defendants.

Case No.: 7:26-cv-9300

**COMPLAINT**

Plaintiff, Consumer Reports, Inc. ("Plaintiff" or "CR"), brings this Complaint against Defendants Benjamin Moskowitz ("Moskowitz"), Two Planets Away LLC ("Two Planets"), and Ginny Fahs ("Fahs") (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1. While they were still employed by CR and being paid to build CR's own artificial-intelligence and consumer-data products, Moskowitz (CR's former Vice President, Innovation Lab) and Fahs (CR's former Senior Director, Emerging Products & Services) founded and operated a competing company, Two Planets. Moskowitz is Two Planets' Co-founder and Chief Executive Officer. Fahs is Two Planets' Co-founder and Chief Product Officer.

2. Moskowitz and Fahs organized Two Planets to compete directly with CR. Its product, which Moskowitz and Fahs named "Plumb," aggregates and normalizes structured consumer product-testing data and licenses it to artificial-intelligence platforms, retailers, and other commercial buyers. Two Planets' own seed investment memorandum describes Plumb as "building the independent, machine-readable product quality layer that gives AI agents a way to align with consumers' actual interests." This is the same category of data, and the same emerging market, that CR's Innovation Lab was developing under Moskowitz and Fahs' leadership.

3. Two Planets identified CR by name as its competitor. Two Planets' seed investment memorandum lists Consumer Reports as a "player" in the market and describes CR's "[l]imitation" as "501(c)(3) governance; built for magazines, not APIs." Two Planets' risk analysis states that CR was "actively researching this market and positioning as a potential solution builder," and its competitive assessment raised the "CR threat" level accordingly.

4. Two Planets' product depended on obtaining CR's confidential data. Two Planets' investment memorandum states that Plumb would license data from "established consumer testing organizations," including Consumer Reports, and identifies "[e]xclusive and preferential licensing agreements with international consumer testing organizations" as the first of the three sources of Plumb's competitive "moat." Two Planets selected home appliances, air quality, and kitchen products as its "beachhead" launch categories because they were "categories where Consumer Reports has deep existing data."

5. While employed by CR and developing a competing product on behalf of Two Planets, Moskowitz and Fahs planned to negotiate against CR's interest. Moskowitz and Fahs developed a proposal under which CR would license its product test results, category taxonomy, and historical testing data to Two Planets on terms Two Planets set, in exchange for a revenue share of 15-20%, a "[n]ominal annual license" of $25,000-$50,000, or a program-related investment plus a discounted license and equity. Moskowitz and Fahs priced CR's data using their nonpublic knowledge of CR's data, drafted the proposal "as if from CR's perspective, not Plumb's," directed that its tone and details be adapted "for whoever the internal [CR] champion would be," and identified the next step as a "30-minute conversation between Ben, Ginny, and the CR champion." Moskowitz and Fahs prepared this proposal while CR employed and compensated

them, and they selected the commercial terms and internal CR audience for it using knowledge they held only by virtue of their CR positions.

6. Moskowitz and Fahs never disclosed Two Planets to CR. CR's Conflict of Interest Policy required each of them to disclose, both annually and promptly as circumstances changed, their ownership interests in limited liability companies, their affiliations with outside for-profit organizations, and any other business relationship posing an actual or perceived conflict. The policy also required express approval before an employee undertook outside work and prohibited the use of CR equipment, services, or personnel in connection with it. Moskowitz and Fahs each signed CR's Conflict of Interest Policy attestation and each certified that no such interest, affiliation, or relationship existed. Neither Moskowitz nor Fahs supplemented their certifications to disclose Two Planets, their officer roles in it, their competing product, or their plan to license CR's data to it.

7. Moskowitz and Fahs built Two Planets during their CR employment. Two Planets was first incorporated in July 2024, Fahs created its five-year financial model on October 31, 2025, and Moskowitz and Fahs advanced its product plans, licensing proposal, and funding strategy through March 2026.

8. Then, to build Two Planets, Moskowitz took CR's confidential data. In the final days of his employment, Moskowitz violated numerous company policies by surreptitiously and without any legitimate business purpose downloading and copying thousands of CR's sensitive, confidential, and proprietary files to his personal computers and devices.

9. During what would be his last week of employment with CR, Moskowitz used his AI agent to "[p]lay out concrete scenarios for how we can get [Plumb] capitalized and incorporated, quickly."

10. On March 26, 2026, over a condensed period of time, Moskowitz downloaded approximately 2,858 CR documents, including strategic plans, proprietary research and development materials, artificial intelligence product roadmaps, confidential partnership and acquisition analyses, financial and budget documents, and other files containing highly sensitive information. Many of these files were designated or treated as private, restricted, or confidential. This download occurred four days before CR was to notify him of his separation, and immediately before CR revoked his access to CR systems. At this time, Moskowitz was actively planning his departure from CR. Two Planets' own planning materials from that same week treated Moskowitz and Fahs' "CR departure" as a pending item and conditioned specific investor outreach on their departure.

11. Moskowitz's misconduct was not isolated or accidental. CR's further investigation uncovered that Moskowitz also synchronized files from CR's Google Workspace to at least four different personal computers or devices, which continued up until the moment his access was revoked; executed a custom script on CR's Google Workspace files that copied more than a thousand CR files into a backup folder he created inside CR's Google Drive environment; and, beginning March 19, 2026 and continuing until CR revoked his access, sent emails from his CR email account containing CR information to his personal email address. The personal devices, none of which are owned or controlled by CR, remain in Moskowitz's possession.

12. When questioned by CR on March 27, 2026, Moskowitz offered a terse justification for his conduct by claiming that the downloads were necessary to prepare for a purported "strategic planning meeting." No such strategic meeting existed, no executive requested such preparation, and Moskowitz's explanation was inconsistent with CR's established business practices. In fact,

Moskowitz's CR calendar shows that on the day of the purported "strategy meeting," Moskowitz only had a regularly scheduled quarterly meeting.

13. The CR data Moskowitz took aligns with Two Planets' own planning documents, which address AskCR's underlying product guidance function, the licensing of CR testing data, and the categories in which CR's testing data is deepest. Two Planets received and benefited from CR's data and from the CR-derived relationships and knowledge Moskowitz and Fahs contributed to it.

14. Despite multiple requests, Moskowitz has refused to produce for forensic examination all of the personal devices on which he placed CR information. As a result, CR has been unable to determine the full scope of what files Moskowitz copied, where those files may have been stored or duplicated, or whether they have been transmitted, shared, or used for purposes entirely unrelated to CR's business. Moskowitz's refusal to promptly submit his personal devices for forensic analysis has prevented CR from securing, containing, and remediating the damage caused by his actions.

## **JURISDICTION AND VENUE**

15. This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the remaining claims asserted herein pursuant to 28 U.S.C. § 1367.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claim occurred here, a substantial part of the property that is the subject of the action is situated here, Moskowitz and Fahs regularly traveled to this District to conduct business as CR employees, the injury to CR was caused within this District, and Defendants are deemed to reside here.

## PARTIES

### A. Consumer Reports

17. CR is a nonprofit organization with its principal place of business in Yonkers, New York. CR is dedicated to consumer protection and advocacy and operates extensive research, product development, and innovation functions in furtherance of its mission.

18. Through its Innovation Lab and related business units, CR develops proprietary products, services, research, and technology-driven initiatives, including consumer-facing tools, artificial-intelligence-enabled platforms, and data-driven services. In connection with this work, CR creates and maintains substantial confidential information, trade secrets, intellectual property, and other proprietary or nonpublic materials of significant value (collectively, "Confidential Information and Trade Secrets").

### B. Defendant Benjamin Moskowitz

19. Defendant Benjamin Moskowitz is an individual who, upon information and belief, resided in Brooklyn, New York at all relevant times. Moskowitz was employed by CR as its Vice President, Innovation Lab from July 26, 2019 to April 10, 2026. Moskowitz is also a member, manager, and officer of Two Planets Away LLC.

### C. Defendant Two Planets Away LLC

20. Defendant Two Planets Away LLC is a Delaware limited liability company, first incorporated on July 8, 2024. Two Planets owns and operates the internet domain twoplanets.org. Two Planets is the company Moskowitz and Fahs organized, capitalized, and operated to develop and license the "Plumb" product described herein.

21. Upon information and belief, Moskowitz is a member and manager of Two Planets and, at all relevant times, held and exercised authority to act on its behalf. Moskowitz is Two Planets' Co-founder and Chief Executive Officer.

22. Upon information and belief, Moskowitz acted within the scope of his Two Planets authority, in furtherance of Two Planets' business, and for Two Planets' benefit when he engaged in the conduct described in this Complaint, including when he acquired, retained, and used CR's Confidential Information and Trade Secrets to develop Plumb and when he solicited investors and prospective licensees on Two Planets' behalf. Two Planets received the benefit of this conduct and knew, or had reason to know, that the information and relationships Moskowitz contributed to it were derived from his CR employment.

**D. Defendant Ginny Fahs**

23. Defendant Ginny Fahs is an individual who, upon information and belief, resided in Brooklyn, New York at all relevant times. Fahs was employed by CR from July 26, 2021 to September 26, 2026, most recently as Senior Director, Emerging Products & Services, in CR's Innovation Lab.

24. Fahs is Two Planets' Co-founder and Chief Product Officer. Upon information and belief, Fahs accepted that Two Planets role, accepted assigned work on Two Planets' behalf, and performed that work while she remained employed by CR.

25. Upon information and belief, Fahs acted within the scope of her Two Planets authority, in furtherance of Two Planets' business, and for Two Planets' benefit when she engaged in the conduct described in this Complaint, including when she solicited investors and prospective data licensors on Two Planets' behalf and participated in developing Two Planets' proposal to license CR's data. Two Planets received the benefit of this conduct and knew, or had reason to know, that the information and relationships Fahs contributed to it were derived from her CR employment.

## FACTUAL ALLEGATIONS

### A. Consumer Reports' Confidential Information and Trade Secrets and the Commercial Advantage They Provide

26. CR's Confidential Information and Trade Secrets include, but are not limited to, the strategy, research, and development materials for AskCR, CR's artificial-intelligence product guidance engine, including its technical architecture, data strategy, and trust and safety workflows; user, demographic, and product development information for Permission Slip, CR's consumer data-rights application; CR's product-testing methodologies, category taxonomy, and historical testing data; CR's artificial-intelligence and product roadmaps; CR's confidential partnership, licensing, and acquisition analyses; and CR's financial, budget, and Board Finance Committee materials. CR's Confidential Information and Trade Secrets are critical to its ability to compete in the marketplace and for the viability and success of its business.

27. CR invests considerable time, resources, and expense to develop its Confidential Information and Trade Secrets and to safeguard that information through technical, contractual, and organizational security measures, including access controls, data-loss-prevention systems, and policies governing employee access to CR systems and data.

28. CR competes commercially. Although organized as a nonprofit, CR funds its mission through revenue-generating activities, including paid memberships, subscription products, and the licensing and distribution of its product-testing data and ratings. CR currently serves approximately five million paying members. CR's AskCR artificial-intelligence product and its Permission Slip application were developed to increase the value CR delivers to those paying members and to position CR in the market for artificial-intelligence-mediated product guidance and consumer data services.

29. CR's product-testing data, methodology, and ratings have commercial value to third parties. CR has developed that data over decades of testing and has expended substantial sums, including millions of dollars of philanthropic support directed to CR's Innovation Lab and Digital Lab, to build the products, data assets, and institutional relationships that define its competitive position, including CR's relationships with the institutional donors and individual donors who support its work.

30. In his role at CR, Moskowitz held a senior leadership position with broad responsibility for initiatives relating to innovation, product development, data strategy, artificial intelligence, and partnerships.

31. In her role at CR, Fahs led product development for CR's consumer-facing digital products, including Permission Slip and AskCR, and had access to CR's Confidential Information and Trade Secrets concerning those products.

32. By virtue of their senior leadership roles, Moskowitz and Fahs were each entrusted with and privy to CR's most sensitive and confidential information, including strategic plans, proprietary research and development materials, internal analyses, financial and budgetary information, and confidential personnel and organizational documents. Fahs had access to CR's Confidential Information and Trade Secrets concerning Permission Slip and AskCR, the products she led, and Moskowitz possessed detailed, nonpublic knowledge regarding the development, strategy, and operation of both.

### B. Consumer Reports' Written Policies Governed Moskowitz and Fahs' Access to Consumer Reports' Data, Ownership of Their Work Product, and Disclosure of Outside Business Interests

33. At all relevant times, CR maintained written information security policies governing employee access to CR systems, handling of CR data, and the use of both CR-issued and employee-owned devices for CR business (collectively, "IT Policies"). The IT Policies

applied to all employees, including Moskowitz and Fahs, and were designed to protect CR's Trade Secrets from unauthorized access, copying, retention, or disclosure.

34. CR's IT Policies entitle CR to inspect, access, and secure CR data on any personal devices used by employees, including Moskowitz and Fahs, in connection with CR business.

35. During their employment, Moskowitz and Fahs were each granted extensive access to CR's internal systems, subject to CR's policies and their ongoing duties of loyalty, confidentiality, and care. Each understood that CR's Confidential Information and Trade Secrets were to be accessed and used solely for legitimate CR business purposes, and not retained, copied, or transferred for personal use or for any purpose outside the scope of their employment.

36. CR's IT Policies impose strict conditions on the use of personal or employee-owned devices to access CR data. Under CR's IT Mobile Device Use Policy, "**[e]mployees who have configured their personal mobile devices to receive and transmit CR Data for work-related activities agree – at CR's request – to bring their Employee-Owned Mobile Device(s) to IT Support for the permanent removal of CR data from the device.**" (Compl. Ex. A at p.8 (emphasis added)).

37. CR's IT Mobile Device Use Policy also makes clear that CR retains inspection and access rights over CR data residing on personal devices and that employees must cooperate when CR seeks access in connection with investigations. Specifically,

> **Employees acknowledge and agree that CR may access CR data on their Employee-Owned Mobile Device(s) to the extent reasonably necessary to support CR's legitimate business purposes, including without limitation in connection with investigations, security incidents, and litigation** (e.g., as part of e-discovery). Employees agree to cooperate with CR staff in the retrieval of CR documents or other CR data, and agree to comply with CR's requests to preserve any such CR data.

(Compl. Ex. A at p.8 (emphasis added)).

38. CR's Acceptable Use Policy expressly limits how employees may access and use CR systems and data. The policy provides that employees may use their account access and system privileges "to perform ONLY those tasks and functions (a) directly related to my employment with or engagement by CR and (b) assigned to me by my manager or supervisor," and further requires that all account information be treated as "confidential and proprietary" and used "only for the purpose for which [the employee is] expressly authorized to access such information." (Compl. Ex. B at p.3).

39. CR's IT Policies also strictly prohibit the local storage of CR proprietary and sensitive information on personal devices. CR's IT Equipment External Use Policy provides that "[a]ll mobile computers should not have proprietary information stored on the devices whenever possible," and that "[a]ll removable, portable data devices such as . . . flash and USB drives must not contain any proprietary information." (Compl. Ex. C at p.1-2). Consistent with these requirements, CR's IT Mobile Device Use Policy further states that "'sensitive classified data' may not be stored on either CR-Supplied Mobile Devices or Employee-Owned Mobile Devices, whether or not encrypted," and "'classified data' may not be stored on Employee-Owned Mobile Devices." (Compl. Ex. A at p.9).

40. CR's Intellectual Property Policy confirms that all work product created by CR employees belongs exclusively to CR and may not be retained or treated as personal property. Specifically, the Intellectual Property Policy provides that

> CR retains legal ownership of the product of all work created by CR employees in the course of their employment at CR. No work product created during CR employment can be claimed or presented as an individual employee's property, even after the conclusion of employment with CR or completion of the relevant project. This includes written and electronic documents, audio and video recordings, system code, and also any concepts, ideas or other intellectual property developed for CR.

(Compl. Ex. D at p.1). The Intellectual Property Policy further emphasizes that "confidential information must remain so even after the end of employment at CR." (Id.)

41. Finally, CR's Conflict of Interest Policy requires all employees to "disclose all potential conflicts, or those that may be perceived as such," on an annual basis and "promptly upon the occurrence of any situation that would otherwise require disclosure" pursuant to the policy. (Compl. Ex. E at p.2). Required disclosures under the Conflict of Interest Policy include (1) "all investments," which includes ownership interests in companies; (2) "memberships and affiliations with any commercial, non-profit and governmental entities and organizations"; and (3) "any other personal or business relationships that could pose a real or perceived conflict of interest." (Id. at p.4). In addition, the policy prohibits work outside of CR without CR's "express approval." (Id.)

42. By virtue of their senior leadership positions, Moskowitz and Fahs were each well aware of CR's IT Policies, Intellectual Property Policy, and Conflict of Interest Policy, and of the heightened trust CR placed in them. Each understood that access to CR's systems was conditioned on compliance with those policies and that CR retained the right to control, inspect, secure, and remove CR data from any device used to access CR systems, including personal devices.

43. Despite CR's repeated requests and his obligation under CR's IT Policies, Moskowitz has refused to provide the personal devices and accounts containing CR data for inspection and remediation.

### C. Moskowitz and Fahs Founded and Operated a Competing Company While Employed by Consumer Reports and Used Consumer Reports' Confidential Information and Trade Secrets to Develop Its Product

44. Moskowitz's copying of CR files was not an isolated act of accidental retention. It occurred while Moskowitz and Fahs were actively building and capitalizing Two Planets, a self-described competing company. Moskowitz and Fahs organized Two Planets in July 2024,

developed its product and financial plans through 2025, and were actively building and capitalizing Two Planets—a self-described competing company—in the final weeks before Moskowitz copied CR's files.

45. Two Planets developed "Plumb," which Two Planets described in its own seed investment memorandum, dated March 2026. Two Planets' materials describe Plumb as "building the machine-readable product quality layer for AI shopping agents." Plumb's core product is an application programming interface, or API, that aggregates and normalizes structured product-quality assessments—covering safety, durability, performance, and value—into a machine-readable schema that artificial-intelligence platforms, retailers, and other commercial buyers can ingest. Two Planets planned to license that data product on a per-query, subscription, and enterprise basis.

46. Moskowitz and Fahs built Two Planets, and developed an artificial-intelligence tool, which they configured to operate from two email addresses on Two Planets' own internet domain: plumb@twoplanets.org and tpcos@twoplanets.org (the "Plumb AI Agent"). Moskowitz drafted Two Planets' strategy documents, financial models, milestone roadmap, task tracker, capitalization scenarios, and licensing memoranda using the Plumb AI Agent. The Plumb AI Agent, which Moskowitz created, was described in those emails as "an AI assistant working on the Plumb project," and those emails confirmed that "Ben and Ginny are CC'd on all messages." Moskowitz and Fahs directed the work by replying to those emails, and their instructions were then "incorporated into the next iteration" of Two Planets' planning documents.

47. The Two Planets documents quoted in this Complaint are Defendants' own records, and CR obtained them from Moskowitz during discovery in Consumer Reports, Inc. v. Moskowitz, Index No.: 62501/2026, which was filed in the Supreme Court of the State of New York, County

of Westchester. The documents described below are just some of the documents Moskowitz and Fahs created using the Plumb AI Agent and were obtained from Moskowitz's personal email account.

48. Two Planets' business model depended on obtaining CR's data. Plumb's investment memorandum states that Plumb would license data from "established consumer testing organizations," explicitly names Consumer Reports as an organization from whom Plumb would license data, and identifies "[e]xclusive and preferential licensing agreements with international consumer testing organizations" as the first of the three sources of Plumb's competitive "moat."

49. Text messages between Moskowitz and Fahs show that Moskowitz proposed creating "a brand-new, self-funded company with deep CR roots" in which "CR receives ~10% equity in exchange for perpetual data licensing rights," and contemplated that "[t]he new entity could later acquire or ingest other datasets beyond CR's." A five-year financial model circulated by Fahs on October 31, 2025 treated CR's data as Two Planets' "seed trust layer" and its "foundational trust credential," priced CR's data at a "flat annual license fee of $2 million," projected Two Planets' revenue growing to $500 million by Year 5 at operating margins exceeding 80%, and identified an alternative structure in which CR would receive equity in exchange for perpetual data and brand licensing rights.

50. Two Planets selected Plumb's initial product categories in its go-to-market plan because of Defendants' access to CR's data. Two Planets' materials designate home appliances, air quality, and kitchen products as the "beachhead" categories for launch—the categories in which CR has the deepest existing testing data.

51. Fahs asked to be brought into Two Planets while she was still employed by CR. On the morning of March 22, 2026—four days before Moskowitz copied 2,858 CR files—

Moskowitz forwarded Fahs a message generated by the Plumb AI Agent and wrote, in his own words, "Plumb is now building itself :) Let me know if you want to get added to these emails — they're for steering purposes." Fahs replied the same morning, "So cool, please add me!!" Three days earlier, on March 19, 2026, Fahs commented on Two Planets' planning documents and proposed "some sort of trustmark / consumer brand companion that would appear on shopping agent or retailer sites to signal use of the API."

52. Moskowitz and Fahs divided Two Planets' work between themselves explicitly. The milestone roadmap, revised March 24, 2026, states the division expressly: "Ben fundraises, Ginny builds prototype." Fahs took responsibility for Two Planets' legal setup, including "SAFE docs" and the entity "charter," for building Two Planets' API prototype, and for licensor outreach to a foreign consumer-testing organization. Moskowitz took responsibility for incorporation, capitalization, and investor activation.

53. Two Planets' task tracker, sent March 24, 2026, lists eighteen tasks with named owners "ben" and "ginny," together with priorities, deadlines, and dependencies. Moskowitz and Fahs ranked their highest-priority tasks as incorporating a Delaware public benefit corporation by April 1, 2026, engaging a startup lawyer, and "activat[ing]" named donors.

54. Moskowitz and Fahs took Two Planets into the market and solicited outside capital for it while Moskowitz remained employed by CR. Two Planets capitalization pipeline identified more than twenty of CR's donors by name, organized them by "warmth," assigned outreach responsibility for each, and tasked Moskowitz with "activat[ing]" specific donors. Moskowitz and Fahs planned more than ten investor and donor conversations and the identification of ten or more qualified business-to-business prospects, with a April 7, 2026 deadline for contacting specific investors.

55. Moskowitz and Two Planets solicited outside capital from donors CR had cultivated. CR develops and maintains its individual and institutional donor relationships at its own expense, and Moskowitz assisted with a number of those relationships in his role as Vice President, Innovation Lab. The investors and donors Two Planets targeted in its capitalization pipeline included donors with whom CR maintained active or prospective relationships.

56. Moskowitz solicited those donors while CR employed and compensated him, and while CR relied on him to steward the same relationships on CR's behalf. Two Planets' capitalization pipeline and the related outreach assignments were in place by March 24, 2026, just two days before Moskowitz copied 2,858 CR files and seventeen days before his April 10, 2026 separation from CR. The deadline Moskowitz and Fahs set for contacting specific investors was April 7, 2026, while Moskowitz remained a CR employee. Moskowitz did not disclose to CR that he was approaching CR's donors for a separate company he owned and led, and he did not seek the approval required by CR's Conflict of Interest Policy before doing so.

57. In soliciting that capital for their own company, Moskowitz and Fahs offered prospective donors the very advantage CR had invested in heavily and built. The Plumb investment memorandum answers the question "[w]hat's your unfair advantage in closing the first licensing deals?" with "[s]ix years of institutional relationships at Consumer Reports, including direct leadership of the initiatives that CR itself identified as strategic priorities for data distribution," together with "[p]arallel relationships with Which? and Stiftung Warentest through CR's international network."

58. Two Planets also planned to approach CR for a data license from the opposite side of the table while Moskowitz and Fahs still worked for CR. Moskowitz and Fahs prepared a licensing memorandum, revised March 23, 2026, proposing a graduated licensing arrangement

under which CR would supply its "[p]roduct test results (ratings, scores, assessments) in structured format," its "[c]ategory taxonomy (how CR organizes product categories and test criteria)," and its "[h]istorical data (trends, score changes over time)." At the memorandum's "[f]ormal pilot" phase, CR would receive one of three sets of commercial terms: a "[r]evenue share (15-20% of Plumb API revenue)," a "[n]ominal annual license ($25-50K/year)," or a "program-related investment ($50-100K PRI) + discounted data license + small equity." The memorandum was revised "per Ben's feedback," was written "as if from CR's perspective, not Plumb's," called for the tone and details to be adapted "for whoever the internal [CR] champion would be," and identified the next step as a "30-minute conversation between Ben, Ginny, and the CR champion."

59. Moskowitz understood that his Two Planets work and his CR duties were separate and in tension. On March 22, 2026, Moskowitz wrote to the Plumb AI Agent: "The CR document you're referring to was written by me, in my capacity as a current CR employee. " In the same message, Moskowitz used the Plumb AI Agent to "play out some concrete scenarios for how we can get this capitalized and incorporated, quickly."

60. Two Planets treated CR as a competitive threat and planned around CR's response. Two Planets' risk analysis states that CR was "actively researching this market and positioning as a potential solution builder," and its competitive assessment accordingly raised the "CR threat" level. Moskowitz prepared for contingencies in "the CR relationship (they love it… they hate it… they're indifferent… etc)."

61. The CR Confidential Information and Trade Secrets that Moskowitz copied on March 26, 2026 and synchronized to his personal devices—including CR's AskCR strategy, research, and development materials, Permission Slip user and demographic information, and CR Board Finance Committee materials—were available to, referenced by, and used in the

development of Two Planets' product plans, financial model, licensing strategy, and investor materials. The files Moskowitz copied correspond in subject matter to Two Planets' own planning documents, which address AskCR's underlying product guidance function, the licensing of CR testing data, and the categories in which CR's testing data is deepest. CR cannot presently determine the full extent of that use because the relevant devices, accounts, and repositories remain in Defendants' exclusive possession, custody, or control, and Moskowitz has refused to produce all of them.

62. Upon information and belief, Two Planets received and benefited from CR's Confidential Information and Trade Secrets and from the CR-derived relationships and knowledge that Moskowitz and Fahs contributed to it, and did so with knowledge or reason to know that Moskowitz had acquired that information while employed by CR, in violation of CR's IT Policies and his duties to CR. That knowledge is established by Two Planets' own materials, which premise its competitive advantage on six years of institutional relationships at CR and on Moskowitz's leadership of CR initiatives, and by Moskowitz's statement to Two Planets that he had authored a CR document "in my capacity as a current CR employee."

## D. Moskowitz and Fahs Failed to Disclose Their Involvement With Two Planets While Employed by Consumer Reports, in Violation of Consumer Reports' Conflict of Interest Policy

63. Pursuant to CR's Conflict of Interest Policy, Moskowitz submitted and signed annual Disclosure of Interest Statements on August 5, 2024 and July 31, 2025. In each, Moskowitz reported "Not Applicable" in response to the request for partnership or other ownership interests in limited liability companies, "Not Applicable" in response to the request for memberships and affiliations with for-profit, non-profit, and governmental organizations, and "Not Applicable" in

response to the catch-all request for "any other business or personal relationships or affiliations . . . that could pose a conflict of interest, or a perceived conflict of interest." (Compl. Exs. F-G).

64. Pursuant to CR's Conflict of Interest Policy, Fahs submitted and signed annual Disclosure of Interest Statements on August 2, 2024 and July 23, 2025. In each, Fahs reported "Not Applicable" in response to the request for partnership or other ownership interests in limited liability companies and "Not Applicable" in response to the catch-all request for "any other business or personal relationships or affiliations . . . that could pose a conflict of interest, or a perceived conflict of interest." Fahs demonstrated that she understood the affiliation disclosure requirement: in both years she affirmatively disclosed her service on the board of the Digital Harbor Foundation. At no point did she disclose her affiliation with Two Planets. (Compl. Exs. H-I).

65. In each annual Disclosure of Interest Statement, Moskowitz and Fahs signed the following attestation: "I have read the Conflict of Interest Policy Statement and the Duties, Definitions, Investment Guidelines, and Procedures for Employees, understand them and agree to abide by them. I attest that, to the best of my knowledge, I am currently in compliance with all of their requirements. I understand that if any of the information provided on this form changes materially in a manner that might raise a conflict of interest or perceived conflict, I am responsible for promptly notifying the appropriate supervisor or manager, the Independent Reviewer, or a member of the CR staff Conflict of Interest Committee." (Compl. Exs. F-I).

66. Moskowitz and Fahs failed to comply with these obligations. Each held an ownership interest in and an officer role with Two Planets, a company organized to license consumer product-testing data in direct competition with CR. Each performed work for Two Planets while employed by CR. Each participated in developing a proposal under which CR would

license its own data to Two Planets. None of this was ever disclosed to CR on an annual Disclosure of Interest Statement, by Supplemental Disclosure, or in any other form, and neither Moskowitz nor Fahs sought or obtained the approval required under CR's Conflict of Interest Policy before they founded Two Planets.

67. CR's Conflict of Interest Policy exists to let CR evaluate and manage conflicts before they cause harm, through an Independent Reviewer empowered to "determine whether an actual or perceived conflict exists, and if so, what actions need to be taken to remove, minimize or manage it." (Compl. Ex. E at p.2). By concealing Two Planets, Moskowitz and Fahs deprived CR of the opportunity to assess the conflict, restrict their access to CR's data, or take any other protective steps. CR continued to compensate Moskowitz and Fahs and to entrust them both with its most sensitive product, strategy, and financial information while each served as an executive officer of a competitor.

**E. Moskowitz Copies and Retains Large Volumes of Consumer Reports' Confidential Information and Trade Secrets**

68. Instead of obtaining the CR data license Two Planets planned for, Moskowitz took CR's data. In the days before his separation, Moskowitz downloaded, copied, synchronized to his personal devices, and emailed to his personal account thousands of CR files, including the AskCR strategy, research, and development materials and the Permission Slip user and demographic information that correspond directly to the product Two Planets was building. Each of these categories constitutes CR Confidential Information and Trade Secrets, was maintained on CR systems subject to access controls and data-loss-prevention measures, and is not available to the public.

69. Because Moskowitz took CR's data rather than licensing it, CR must protect its rights related to its Confidential Information and Trade Secrets through forensic analysis of the

computers and devices Moskowitz used to download thousands of CR files, synchronize CR files, and email CR information. Such forensic analysis is necessary to determine the full extent of Moskowitz's use of CR's Confidential Information and Trade Secrets, including whether he copied, moved, uploaded, altered, transmitted, disclosed, deleted, or otherwise exploited CR information after removing it from CR's systems.

*Moskowitz Downloaded and Synchronized Files onto His Personal Devices*

70. CR planned to inform Moskowitz on March 30, 2026 that his CR employment would be separated. This decision was made months in advance.

71. Four days prior, and immediately before CR revoked his access to its systems, Moskowitz downloaded thousands of CR documents containing CR Confidential Information and Trade Secrets.

72. Specifically, on March 26, 2026, Moskowitz copied approximately 2,858 files from CR's systems to Moskowitz's personal devices. These files included highly sensitive and confidential materials relating to CR's Innovation Lab and related business units, including strategic plans, proprietary research and development documents, artificial-intelligence and product roadmaps, partnership and acquisition analyses, financial and budget materials, internal organizational and personnel documents, and other nonpublic information of substantial value to CR.

73. CR's review to date indicates that the approximately 2,858 files Moskowitz copied include, but are not limited to, (1) strategy, research, and development documents related to AskCR, CR's AI-powered chatbot that helps consumers find product recommendations; (2) user and demographic information related to Permission Slip, a CR mobile app that lets consumers manage and delete their personal data from corporate databases; and (3) CR Board Finance

Committee updates containing confidential financial, operational, and strategic information prepared specifically for CR's Board. By virtue of his senior leadership role at CR, Moskowitz possessed detailed, nonpublic knowledge regarding the development, strategy, and operation of AskCR and Permission Slip. These are the same categories of information on which Two Planets' product design, pricing, and licensing plans depended. Moskowitz copied these files while serving as Two Planets' Chief Executive Officer, just days after Two Planets' planning documents set an April 7, 2026 deadline for investor outreach. Moskowitz used the CR files he copied for Two Planets' benefit and to compete unfairly with CR.

74. Moskowitz's copying, retention, and refusal to return or permit inspection of these materials constitutes misuse of CR's Confidential Information and Trade Secrets because it enables him to reference, search, analyze, disclose, upload, transmit, or otherwise exploit CR's nonpublic product, consumer, financial, operational, and strategic information outside CR's control.

75. Moreover, the forensic evidence shows that Moskowitz created and executed a custom script, which was linked to a newly created Google Cloud Platform project, that automatically copied more than a thousand CR files into a newly created folder titled "_Backup – Unsorted Files." The script systematically analyzed the metadata of each file in CR's Google Workspace for the Innovation Lab and copied every file that was created by Moskowitz. Put simply, Moskowitz's script looked for files he created in the scope of his employment and copied them to a folder he created. It is not clear at this time whether those files were synchronized to his personal computers.

76. Moskowitz's creation and execution of the custom script was an affirmative use of CR's Google Workspace, file metadata, file structure, and Confidential Information and Trade

Secrets to identify, select, aggregate, duplicate, and stage CR files for retention outside the ordinary course of CR business. The script was not needed for the performance of any assigned CR task and instead functioned as an automated mechanism to harvest CR information and place it into a separate backup folder created by Moskowitz.

77. Forensic evidence appears to show that at least four of Moskowitz's personal computers and devices were actively synchronizing files with CR's Google Workspace up to the moment his access was revoked, which would confirm that CR data was being copied to and retained on multiple of Moskowitz's personal devices.

78. Many of the files Moskowitz downloaded on March 26, 2026 contained CR Confidential Information and Trade Secrets. The titles and contents of the downloaded documents reflect core CR intellectual property and trade secret information.

79. Moskowitz had no legitimate business purpose for downloading these files four days before he was to be notified of his separation from CR, leveraging an automated script to find and copy files into a separate "backup" folder, or synchronizing CR's files to what appears to be multiple personal devices. CR's investigation further determined that the explanation Moskowitz later offered for copying the files (i.e., that the thousands of files were copied to prepare for a purported "strategic planning meeting") was contradicted by the evidence. No such strategic meeting existed, no executive requested such preparation, and no business justification warranted downloading thousands of CR files to his personal devices.

80. The available forensic evidence demonstrates that CR files were copied and synchronized to what appears to be at least four additional personal devices belonging to Moskowitz—that is, Moskowitz downloaded thousands of files to his personal devices despite

already synchronizing the entire contents of the CR Google Workspace onto what appears to be four additional copies of those documents.

81. Moskowitz's conduct included multiple forms of unauthorized use of CR's Confidential Information and Trade Secrets, including but not limited to: (a) using CR's Google Workspace to identify and access confidential files; (b) using CR file metadata and folder structures to locate and select CR files; (c) using an automated script to copy and aggregate CR files; (d) using a newly created backup folder to stage and preserve CR information; (e) synchronizing CR files to his personal devices; (f) using his CR email account to transmit CR information to his personal email account; and (g) using his continued possession and control of personal devices to retain CR files and prevent CR from confirming deletion, non-use, or non-disclosure.

82. Upon information and belief, Moskowitz has used CR's Confidential Information and Trade Secrets after removing them from CR's systems, including by retaining them in searchable electronic form, maintaining them on personal devices or accounts, and refusing to permit CR to inspect or remove them. CR cannot determine the full scope of this use because the relevant devices, accounts, repositories, logs, and storage locations are in Moskowitz's exclusive possession, custody, or control.

*Moskowitz Emailed CR Correspondences to His Personal Email Account*

83. CR's forensic analysis of Moskowitz's CR email account revealed further and potentially ongoing activity, emphasizing the need for immediate action.

84. Specifically, starting March 19, 2026, Moskowitz blind carbon copied or carbon copied his personal email on CR business correspondences. In some instances, the recipient of the email (from Moskowitz's CR email account) appears to have replied to all recipients after

Moskowitz was placed on administrative unpaid leave and after his access to CR systems was revoked.

85. Moskowitz's personal email activity included use of CR information in three ways. First, Moskowitz copied CR data into the body of emails sent to his personal account. Second, Moskowitz attached CR files to emails transmitted to his personal account. Third, Moskowitz added his personal email address as a "Cc:" or "Bcc:" recipient. Each act constituted unauthorized use and disclosure of CR's Confidential Information and Trade Secrets because Moskowitz extracted CR information from the systems in which CR maintained it, transmitted it to a personal account, and created additional copies outside CR's ability to monitor, retrieve, or delete them.

86. On March 27, 2026, CR became aware of the large volume of documents downloaded by Moskowitz on March 26, 2026.

87. On the morning of March 27, 2026, CR's Chief People Officer met with Moskowitz to request an explanation for his download activity. Moskowitz's explanation was that the documents were needed to prepare for what he described as a "strategy meeting." CR informed Moskowitz of its internal data security investigation related to his activity and that his access rights were revoked.

88. Moskowitz's explanation did not account for his use of a custom script to move files into a backup folder he created, his synchronization of CR files to multiple personal devices, or his transmission of CR files and CR information to his personal email account. Nor can Moskowitz's explanation be reconciled with his transmission of CR information to his personal email account during the same period. Preparing for an internal CR meeting would not require moving CR data outside CR's systems to a personal account, and Moskowitz has offered no explanation for doing so.

### F. Moskowitz Refuses to Cooperate to Return Consumer Reports' Confidential Information and Trade Secrets

89. Promptly after discovering Moskowitz's unauthorized downloads and synchronization of CR's files, CR immediately initiated efforts to secure and contain its Confidential Information and Trade Secrets. To date, Moskowitz has refused to permit CR to conduct any forensic inspection of his personal devices, despite CR's repeated requests and detailed explanations of the need for such access.

90. Moskowitz's refusal to provide access to his personal devices is particularly significant because those devices and accounts are the only means by which CR can determine the full extent of Moskowitz's use of CR's Confidential Information and Trade Secrets. Without access to those devices and accounts, CR cannot fully determine whether Moskowitz used the information for commercial, competitive, or other purposes in connection with Moskowitz's employment outside of CR.

91. Moskowitz's refusal to provide his personal devices containing CR data constitutes an ongoing violation of CR's IT Policies, including his obligation to cooperate with CR's efforts to retrieve, preserve, and remove CR data from employee-owned devices used for CR business. Absent an order compelling Moskowitz's compliance with his obligations under CR's IT Policies, CR cannot adequately protect its Confidential Information and Trade Secrets or determine the extent of Moskowitz's misconduct.

## COUNT I
## MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT
## 18 U.S.C. § 1836 ET SEQ.
## (Against Moskowitz and Two Planets Away LLC)

92. CR repeats and realleges Paragraphs 1 through 91 as if fully set forth herein.

93. CR owns and possesses the Confidential Information and Trade Secrets described above, which constitute trade secrets.

94. CR's Confidential Information and Trade Secrets relate to products and services used in, and intended for use in, interstate and foreign commerce.

95. CR has taken reasonable measures to keep its Confidential Information and Trade Secrets secret, including the access controls, data-loss-prevention systems, data classifications, and written IT Policies described above.

96. Moskowitz and Two Planets have misappropriated or solicited, conspired, or participated in the misappropriation of this information as alleged herein.

97. Moskowitz and Two Planets have failed to return to CR the Confidential Information and Trade Secrets which, on information and belief, are collectively in their possession.

98. Moskowitz acquired CR's Confidential Information and Trade Secrets by improper means and in breach of his duty to maintain their secrecy.

99. Upon information and belief, Moskowitz and Two Planets have also used and disclosed CR's Confidential Information and Trade Secrets without CR's consent, including in developing Two Planets' product, financial model, and licensing strategy, and in soliciting investors, donors, and prospective licensees on Two Planets' behalf.

100. CR will continue to suffer from Moskowitz and Two Planets' possession of CR's Confidential Information and Trade Secrets including, but not limited to, actual damages, lost profits, reputational harm, and the diminution in value of its Confidential Information and Trade Secrets. The possession of CR's Confidential Information and Trade Secrets unjustly enriches Moskowitz and Two Planets.

101. Moskowitz and Two Planets' misappropriation of CR's Confidential Information and Trade Secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive. CR is entitled to an award of exemplary damages and reasonable attorneys' fees.

**COUNT II**
**MISAPPROPRIATION UNDER NEW YORK COMMON LAW**
**(Against Moskowitz and Two Planets Away LLC)**

102. CR repeats and realleges Paragraphs 1 through 101 as if fully set forth herein.

103. CR owns and possesses the Confidential Information and Trade Secrets described above, which constitute trade secrets and comprise information that is used in CR's business, is not known or readily ascertainable outside CR, was developed through substantial effort and expense, and gives CR an opportunity to obtain an advantage over competitors who do not know or use it.

104. In the course of his employment, Moskowitz was provided with access to CR's Confidential Information and Trade Secrets solely for legitimate CR business purposes pursuant to his job duties and within the relationship of trust and confidence CR placed in Moskowitz as Vice President, Innovation Lab.

105. Moskowitz took CR's Confidential Information and Trade Secrets without authorization and has used or disclosed it without authorization from CR. Moskowitz used CR's Confidential Information and Trade Secrets to secure a competitive advantage for himself and for Two Planets, including in formulating Two Planets' product design, category selection, pricing and licensing model, and investor presentations.

106. Two Planets is using or disclosing CR's Confidential Information and Trade Secrets. Moskowitz, acting as an officer of Two Planets within the scope of his authority and in furtherance of its business, conveyed CR's Confidential Information and Trade Secrets to Two

Planets, which used it in developing and marketing Plumb, a product that competes with CR in the market for structured consumer product-quality data and that Two Planets' own materials identify as competing with CR, with knowledge or reason to know that it had been acquired in breach of Moskowitz's obligations to CR.

107. As a consequence of Moskowitz and Two Planets' misappropriation, CR has been damaged and is entitled to compensatory and punitive damages to be proven at trial.

108. Upon information and belief, Moskowitz and Two Planets have profited and will continue to profit from the aforesaid misappropriation of CR's Confidential Information and Trade Secrets.

**COUNT III**
**BREACH OF THE DUTY OF LOYALTY UNDER NEW YORK COMMON LAW**
**(Against Moskowitz and Fahs)**

109. CR repeats and realleges Paragraphs 1 through 108 as if fully set forth herein.

110. By virtue of his position as Vice President, Innovation Lab, and a senior executive of CR, Moskowitz owed CR a duty of loyalty, good faith, honesty, and fidelity.

111. Within the scope of his employment, CR entrusted Moskowitz with significant authority and discretion, including leadership over core innovation initiatives, access to CR's strategic planning and decision-making, and responsibility for safeguarding CR's Confidential Information and Trade Secrets.

112. CR entrusted Moskowitz with access to highly sensitive confidential and proprietary information, including strategic plans, research and development materials, product and technology roadmaps, internal analyses, financial information, and personnel materials. This access was for the sole purpose of enabling Moskowitz to perform his job responsibilities on CR's behalf.

113. Moskowitz owed CR a duty not to exploit his position, access, or authority, and not to misuse CR's Confidential Information and Trade Secrets, for any purpose inconsistent with CR's interests or outside the scope of his employment.

114. Moskowitz owed CR a duty not to exploit his position by violating company policies which restrict accessing, copying, and using CR data, including CR's Confidential Information and Trade Secrets.

115. Moskowitz owed CR a duty, under CR's Conflict of Interest Policy and as a matter of his fiduciary obligation, to disclose his ownership interest in and officer role with Two Planets, his affiliation with a company competing with CR, and his participation in a proposed transaction between CR and Two Planets. Moskowitz signed CR's Conflict of Interest attestation and personally affirmed to notify CR "promptly" if his circumstances changed in a manner that might raise an actual or perceived conflict.

116. Moskowitz owed CR a duty not to exploit his position by misusing CR company resources, including Google Workspace, the ability to remotely access CR data subject to CR's policies, and his CR issued email account. He also owed CR a duty not to compete with CR while employed by CR, and not to divert to himself or to others a business opportunity belonging to CR. He further owed CR a duty not to use the donor and other institutional relationships CR developed and maintained at its own expense for his own benefit or for the benefit of a competing venture.

117. While still employed by CR, Moskowitz knowingly and deliberately:

- Copied, downloaded, and retained large volumes of CR's Confidential Information and Trade Secrets to what appears to be at least four of his personal devices, and used unauthorized automated scripts and other means

to aggregate and copy CR data for purposes unrelated to the faithful performance of his duties to CR.

- Emailed CR data to his personal email address and included his personal email address in correspondences related to CR business.
- Used CR company resources in a manner that violates CR's policies, including CR's Conflict of Interest Policy, which prohibits the use of CR equipment, services, or personnel in connection with outside work.
- Failed to disclose, on any annual Disclosure of Interest Statement, by Supplemental Disclosure, or otherwise, his ownership interest in and officer role with Two Planets, a company competing with CR, while certifying to CR that he had no such interest, affiliation, or relationship.
- Performed outside work for Two Planets without seeking or obtaining the express approval CR's Conflict of Interest Policy requires.
- Co-founded and served as Chief Executive Officer of Two Planets, a company that competed with CR and whose product depended on CR's data.
- Solicited investment support for Two Planets from donors with whom CR had existing or prospective donor relationships, including relationships he assisted with maintaining on CR's behalf, without disclosing this solicitation to CR.

118. Moskowitz engaged in this conduct in anticipation of the end of his CR employment, while continuing to hold a position of trust and while CR reasonably believed he was acting solely in CR's best interests.

119. Moskowitz engaged in this conduct knowingly with the intent and purpose to circumvent his obligations to CR and to deprive CR of the benefit and value of the obligations promised, bargained for and undertaken, for which CR paid Moskowitz generously.

120. Moskowitz breached his duty of loyalty to CR by, inter alia:

- Misappropriating CR's Confidential Information and Trade Secrets, exceeding the scope of his authorized access, and placing his own interests above those of CR while still in CR's employ.
- Emailing CR data to his personal email address and including his personal email address in correspondences related to CR business.
- Using CR company resources in a manner that violates CR's policies, including but not limited to each of the following: CR's IT Mobile Device Use Policy; CR's Acceptable Use Policy; CR's IT Equipment External Use Policy; CR's Intellectual Property Policy; and CR's Conflict of Interest Policy.
- Concealing from CR his ownership interest in and officer role with a competing company, Two Planets, in violation of CR's Conflict of Interest Policy and the attestation he signed, and thereby depriving CR of the opportunity to evaluate, manage, or limit the conflict.
- Approaching CR's donors for the benefit of a competing company while employed by CR, and placing himself in competition with CR for the philanthropic and investment support on which CR relies.

121. By this conduct, Moskowitz violated his duty of loyalty to CR and rendered his services faithless during the period in which he engaged in such misconduct. Moskowitz's disloyal

conduct was related to the performance of his CR duties and permeated his service to CR in its most material and substantial part, in that the competing company he built addressed the same data, products, markets, and institutional relationships—including the donor relationships that CR maintained at its own expense—that CR employed and compensated him to develop. CR neither knew of nor tolerated this conduct, and could not have discovered it, because Moskowitz affirmatively certified to CR that no such conflict existed and never supplemented that certification.

122. As a result of Moskowitz's disloyal conduct, CR is entitled to recover from him all compensation paid to him during the period of his faithless service, including salary, bonuses, and benefits.

123. By virtue of her position as Senior Director, Emerging Products & Services, in CR's Innovation Lab, Fahs owed CR a duty of loyalty, good faith, honesty, and fidelity.

124. Within the scope of her employment, CR entrusted Fahs with significant authority and discretion, including leadership of product development for CR's consumer-facing digital products, access to CR's product strategy and decision-making, and responsibility for safeguarding CR's Confidential Information and Trade Secrets.

125. Fahs owed CR a duty not to exploit her position, access, or authority, and not to misuse CR's Confidential Information and Trade Secrets, for any purpose inconsistent with CR's interests or outside the scope of her employment. She also owed CR a duty not to compete with CR while employed by CR, and not to divert to herself or to others a business opportunity belonging to CR.

126. Fahs owed CR a duty, under CR's Conflict of Interest Policy and as a matter of her fiduciary obligation, to disclose her ownership interest in and officer role with Two Planets, her

affiliation with a company competing with CR, and her participation in a proposed transaction between CR and Two Planets. Fahs signed CR's Conflict of Interest attestation and personally affirmed to notify CR "promptly" if her circumstances changed in a manner that might raise an actual or perceived conflict.

127. While still employed by CR, Fahs knowingly and deliberately:

- Accepted and held the roles of Co-founder and Chief Product Officer of Two Planets, a company that competed with CR and whose product depended on CR's data.
- Solicited inclusion in Two Planets' steering correspondence and provided product input on Two Planets' offering.
- Accepted and performed assigned responsibility for Two Planets' formation documents and charter, for building its application programming interface prototype, and for licensor outreach to a foreign consumer-testing organization.
- Participated with Moskowitz in developing and advancing the proposal under which CR would license its testing data to Two Planets on terms Two Planets set.
- Failed to disclose, on any annual Disclosure of Interest Statement, by Supplemental Disclosure, or otherwise, her ownership interest in and officer role with Two Planets, a company competing with CR, while certifying to CR that she had no such interest or relationship, and undertook outside work for Two Planets without the express approval CR's Conflict of Interest Policy requires.

128. Fahs engaged in this conduct in anticipation of the end of her CR employment, while continuing to hold a position of trust and while CR reasonably believed she was acting solely in CR's best interests.

129. Fahs engaged in this conduct knowingly with the intent and purpose to circumvent her obligations to CR and to deprive CR of the benefit and value of the obligations promised, bargained for and undertaken, for which CR paid Fahs generously.

130. Fahs breached her duty of loyalty to CR by, inter alia:

- Competing with CR while still in CR's employ and placing her own interests above those of CR.
- Applying CR's nonpublic product and strategy knowledge, and the institutional relationships CR created and maintained at its own expense, for the benefit of a competing company.
- Diverting to Two Planets a business opportunity belonging to CR.
- Concealing from CR her ownership interest in and officer role with Two Planets, a competing company, in violation of CR's Conflict of Interest Policy and the attestation she signed, and thereby depriving CR of the opportunity to evaluate, manage, or limit the conflict.

131. By this conduct, Fahs violated her duty of loyalty to CR and rendered her services faithless during the period in which she engaged in such misconduct. Fahs' disloyal conduct was related to the performance of her CR duties and permeated her service to CR in its most material and substantial part, in that the competing company she co-founded addressed the same consumer-facing digital products, data, and markets that CR employed and compensated her to develop. CR neither knew of nor tolerated this conduct, and could not have discovered it, because Fahs

affirmatively certified to CR that no such conflict existed and never supplemented that certification.

132. As a result of Fahs' disloyal conduct, CR is entitled to recover from her all compensation paid to her during the period of her faithless service, including salary, bonuses, and benefits.

133. As a consequence of Moskowitz and Fahs' disloyal conduct, CR has been damaged and is entitled to compensatory and punitive damages to be proven at trial.

**COUNT IV**
**UNFAIR COMPETITION UNDER NEW YORK COMMON LAW**
**(Against All Defendants)**

134. CR repeats and realleges Paragraphs 1 through 133 as if fully set forth herein.

135. CR expended substantial time, labor, skill, and money developing the assets Defendants misappropriated. Over decades, CR developed its product-testing methodology, category taxonomy, and historical testing data. More recently, CR directed substantial philanthropic support and the work of a cross-functional staff to building its Innovation Lab and Digital Lab, developing AskCR and Permission Slip from concept to launch, and establishing the institutional relationships with consumer organizations, artificial-intelligence platforms, and donors that define CR's competitive position.

136. The above assets provide a commercial advantage belonging to CR. CR monetizes these assets through paid memberships, subscription products, and the licensing and distribution of its product-testing data and ratings. Defendants' own materials value that advantage, treating a license to CR's testing data as the foundation of Two Planets' product.

137. Defendants misappropriated CR's commercial advantage for their own benefit. Moskowitz copied and retained CR's strategic, product, research, financial, and consumer

information. Moskowitz and Fahs applied CR's nonpublic strategy and product knowledge, and the institutional relationships CR created and maintained at its own expense, to design a competing data product, to select the categories in which CR's testing data is deepest, to build the Plumb prototype, and to formulate Plumb's pricing and licensing model. Two Planets received, retained, and exploited the benefit of that conduct as the company through which Moskowitz and Fahs competed with CR.

138. Defendants' misappropriation extended beyond their own possession and into the marketplace. Moskowitz and Fahs solicited named investors and donors on Two Planets' behalf, including donors with whom CR had existing or prospective relationships, while presenting CR's institutional relationships and CR-identified strategic priorities as Two Planets' competitive advantage, and pursued licensor outreach to a foreign consumer-testing organization.

139. Defendants appropriated CR's Confidential Information and Trade Secrets in bad faith. Moskowitz and Fahs each held a position of trust at CR and abused the confidential relationship CR reposed in them by acquiring and applying CR's Confidential Information and Trade Secrets while CR continued to compensate them. Moskowitz and Fahs concealed their roles in Two Planets from CR while certifying under CR's Conflict of Interest Policy that no such conflict existed. Moskowitz copied thousands of CR files on the eve of his separation from CR, offered CR a false explanation for the copying that his own calendar contradicted, and refused to permit CR to confirm deletion or non-use. Upon information and belief, Two Planets knew or had reason to know that the information and relationships contributed to it were derived from Moskowitz and Fahs' CR employment and acquired in breach of their obligations to CR.

140. As a consequence of Defendants' unfair competition, CR has been damaged and is entitled to compensatory and punitive damages to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, CR prays that the Court:

A. Grant a permanent injunction against Defendants, and each of them, and all persons acting in concert with them, enjoining them from using, disclosing, or further disseminating CR's Confidential Information and Trade Secrets and from otherwise violating their legal duties to CR, and directing Defendants to return to CR and to destroy all copies of CR's Confidential Information and Trade Secrets in their possession, custody, or control;

B. Direct Defendants to surrender and make available for forensic examination all computers, mobile devices, storage media, cloud-storage repositories, code repositories, email accounts, and other accounts or systems used to access, store, synchronize, transmit, or retain CR data, so that CR may identify, preserve, retrieve, and remove its Confidential Information and Trade Secrets;

C. Direct the forfeiture and disgorgement of all compensation paid to Moskowitz and to Fahs during the respective periods of their faithless service, including salary, bonuses, and benefits, consistent with New York's faithless servant doctrine;

D. Award damages, as described in each of the Counts above, in favor of CR and against Defendants in amounts to be determined at trial, and further directing forfeiture and disgorgement of all amounts unlawfully gained by Defendants during the period of disloyalty;

E. Award punitive damages in favor of CR and against Defendants in amounts to be determined at trial;

F. Award CR pre-judgment and post-judgment interest, its attorneys' fees, and costs and other expenses incurred in this action; and

G. Grant CR such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

CR demands a trial by jury on all issues so triable.

Respectfully submitted,

JACKSON LEWIS P.C.
666 Third Avenue, 28th Floor
New York, New York 10017
(212) 545-4000

150 North Michigan Avenue
Suite 2500
Chicago, IL 60601
(312) 442-6115

Dated: October 23, 2026
New York, New York

By: *<u>/s/ Kenneth K. Suh</u>*
Kenneth K. Suh (*pro hac vice* forthcoming)
Gregory C. Brown, Jr.

*Attorneys for Plaintiff Consumer Reports, Inc.*